THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NEW PRIME, INC.,                                :
                                                :
            Plaintiff,                          :
                                                :
    v.                                          :    3:14-CR-2410
                                                :    (JUDGE MARIANI)
BRANDON BALCHUNE                                :
CONSTRUCTION, INC., POCONO                      :
TRANSCRETE, INC., PATRICK                       :
MCLAINE, P.E., CIVIL DESIGN                     :
PARTNERS, INC., JERRY RANIELI,                  :
SAMUEL J. MARRANCA, SAMUEL J.                   :
MARRANCA GENERAL CONTRACTING                    :
CO., MIDLANTIC ENGINEERING, INC.                :
                                                :
            Defendants.                         :

## MEMORANDUM OPINION

### I. INTRODUCTION

This case concerns the construction of a defective concrete parking lot, for which

plaintiff has brought claims against seven defendants, all of whom were contractors or

subcontractors for the construction project. Plaintiff has alleged eleven counts for breaches

of contract, breaches of implied warranties, and negligence relating to the construction.

Presently before the Court are five motions for summary judgment brought by defendants

against plaintiff. For sake of clarity, the Court will address each of the five motions in a

separate opinion, though the underlying facts of the case remain substantively the same.

This opinion concerns Defendant Midlantic Engineering, Inc. ("Midlantic")'s motion

for summary judgment for (1) dismissal of plaintiff's breach of contract and negligence

1

claims against Midlantic, (2) dismissal of other defendants' crossclaims against Midlantic, and (3) judgment in Midlantic's favor on its crossclaim against Defendant Brandon Balchune Construction, Inc. ("Balchune"). Doc. 210.

## II. STATEMENT OF UNDISPUTED FACTS

Midlantic has submitted a Statement of Material Facts as to which it argues there is no genuine issue or dispute for trial. Doc. 211. Plaintiff submitted an opposition to the motion and an answer to the Statement of Facts. Docs. 283, 284. In addition, three other defendants who oppose Midlantic's motion have filed their own responses to the Statement of Facts. Docs. 260, 275, 279. The result of the complicated web of motion papers is that many of the key facts are disputed in this motion. The Court discerns the following facts as not reasonably in dispute unless otherwise noted.

Plaintiff, New Prime, is a corporation that hired various entities to construct a new parking lot (the "Drop Lot"). Doc. 211 ¶ 1. In August 2012, New Prime hired Balchune, a construction company, as the general contractor for the Drop Lot. *Id.* ¶¶ 1-2. The total contract price of the project was $1,631,278.00. *Id.* ¶ 3. Construction of the Drop Lot began in September, 2012 and was completed in March, 2013. *Id.* ¶ 4. Midlantic is a company that provides "construction inspection and materials testing services" for construction projects. Doc. 211-6, at 1. In July 2012, Balchune called Timothy Burns, President of Midlantic, requesting a proposal for Midlantic's services for the Drop Lot project. Doc. 211 ¶ 6. Midlantic first submitted a standard proposal that included "80-some

2

days of testing services expecting to be present relatively full-time for the concrete pours with an allowance of $38,250." *Id.* ¶ 8. Balchune then called Burns again, advising him that the project did not require full-time testing for the project but only "spot check testing," i.e. for Midlantic to stop by the construction site once a day to sample a truck for concrete test. *Id.* ¶¶ 12-13. Balchune also told Midlantic that the maximum budget for Midlantic's services was $7,500 for the project. *Id.* ¶ 13. As a result, Midlantic submitted a revised proposal on September 21, 2012. *Id.* ¶ 15. Midlantic then proceeded to perform testing services under the revised proposal. *Id.* ¶ 24. It was ultimately paid $6,674 for its services. *Id.* ¶ 156. Midlantic did not have any interaction with any contractor besides Balchune for its work on the Drop Lot. *Id.* ¶ 31.

Both Midlantic's original proposal and revised proposal contained a section called "quality control testing and inspection program," the terms of which are substantively the same. *Compare* Doc. 211-5, at 1-2 *with* Doc. 211-6, at 1-2. The revised proposal states in relevant part:

> We propose to furnish the following testing and inspection services for this project:
>
> ### Geotechnical Inspection and Testing Services
> a) Soil laboratory testing to determine soil classifications and moisture-density relationships for various soil types used in the fill or proposed for use in the fill;
> b) Observation of soil and aggregate fill placement and field density testing by engineering technician personnel to evaluate if earthwork compaction obtained is in accordance with project specifications;
> c) Written reports of our observations, testing activities, and

3

recommendations.

*Structural Inspection and Testing Services*

a) On-site testing and observation of concrete including slump, temperature, percent entrained air, and molding of concrete test cylinders. Reinforcing steel will be inspected and documented with the field testing of the concrete.

b) Transportation, laboratory curing, and compression testing of concrete and grout cylinders, as required.

c) On-site testing and observations of asphalt placement and field density testing by engineering technician personnel to evaluate if asphalt compaction obtained is in accordance with project specifications.

Doc. 211-6, at 1-2. Between the initial proposal and the revised proposal, the only differences in the portion cited above is that the initial proposal contained a provision regarding the "[o]bservation of footing subgrades" that was not in the revised proposal, and the revised proposal's subsection (c) under *Structural Inspection and Testing Services* (the term beginning with "c) On-site testing and observations of asphalt placement...") was not in the initial proposal. *Compare* Doc. 211-5, at 1-2 *with* Doc. 211-6, at 1-2. These differences are not dispositive to the instant motion. The revised proposal also changes the recommended "allowance" for Midlantic's services from $38,250 to $7,500, in accordance with Balchune's second call to Midlantic. *Compare* Doc. 211-5, at 3 *with* Doc. 211-6, at 3. Finally, both proposals specifically exclude the following services: "surveying for line and grade, monitoring of existing structures, quantity or cost estimates, review of design and contract documents, shop drawings, or professional services not detailed herein." Doc. 211-6, at 2.

No party disputes the authenticity of the revised proposal, though Balchune points

4

out that the revised proposal was never signed by Balchune. *See e.g.* Doc. 279, at 2. Balchune does not explicitly dispute Midlantic's statements of facts regarding the initial or the revised proposal, he instead avers that the proposals, which are attached to Midlantic's statements of facts, "speak for themselves and no response is necessary." Doc. 279, at 2. He further asserts that "the proposals attached to Midlantic's Concise Statement of Material Facts were *not signed* by a representative of Balchune" and that the "record is devoid of any evidence that Balchune agreed to indemnify Midlantic." *Id.* (emphasis in original). While it is true that the revised proposal is not signed by Balchune, he has not raised authenticity concerns regarding the revised proposal, nor has he disputed that he and Midlantic proceeded to perform in accordance with the revised proposal after it was submitted to him.

The bulk of the parties' disputed facts arise from their interpretations of the revised proposal. Midlantic avers that its obligations under the proposal *only* included "spot check compression strength cylinder testing and some sub base testing of the subgrade." Doc. 211 ¶ 21. New Prime counters that "[i]n addition to these duties and responsibilities ... Midlantic was obligated to provided slump testing of the concrete after it was delivered by Pocono Transcrete." Doc. 277 ¶ 21. In support of this contention, New Prime cites the deposition of its expert Farshad Rajabipour, who testified that based on his review of the revised proposal, Midlantic was "to test the subgrade, test the subbase, and also test the concrete as it's being delivered," and that Midlantic should have been "involved with the evaluation and testing of the concrete prior to placement and finishing." Doc. 277-9, at 47.

5

In addition, New Prime's expert opined that there were several contributing factors to the defective Drop Lot, including Midlantic's failure "to advise Balchune against the use of PennDOT Class A concrete," Midlantic's failure to warn Balchune that the concrete was subpar "due to its excessive slump and low 7-day compressive strength," and Midlantic's failure to warn Balchune that "testing only one concrete truck per day was too infrequent and in violation of industry standards." Doc. 211 ¶ 82. Midlantic's expert, Joseph Durkin, on the other hand, opined that "analysis and review of the design of the project and the contract parameters simply were not in Midlantic's scope of work." Doc. 211 ¶ 120. Midlantic's statement of facts also include several conclusions of law, stating that it had "no duty to examine the type of concrete...review the design of contract plans...[or] review the concrete mix and make recommendations regarding a new design for the concrete on the project." Doc. 211 ¶¶ 152-53, 155. All of these conclusions are disputed by New Prime as they are conclusions of law. Doc. 277 ¶¶ 152-53, 155.

## III. PROCEDURAL HISTORY

On December 22, 2014, New Prime filed its original complaint naming Balchune and Pocono as defendants. Doc. 1. On August 10, 2015, Prime filed an Amended Complaint adding Patrick McLaine, Civil Design Partners, Jerry Ranieli, Samuel J. Marranca, and Samuel J. Marranca General Contracting Company as defendants. Doc. 36.[1] On July 13,

---

[1] On the same day, Balchune filed a "Joinder Complaint" against Midlantic. Doc. 37. The Joinder Complaint was dismissed on May 5, 2017 following New Prime's addition of Midlantic as a named defendant.

2016, New Prime filed the Second Amended Complaint (which is the operative complaint for this motion), adding Midlantic as a defendant. Doc. 156.

The Second Amended Complaint contains eleven counts as follows: Count I (Breach of Contract as against Balchune); Count II (Breach of Warranty as against Balchune); Count III (Breach of Warranty as against Pocono); Count IV (Breach of Contract as against Patrick McLaine and Civil Design Partners); Count V (Breach of Warranty as against Patrick McLaine and Civil Design Partners); Count VI (Breach of Contract as against Jerry Ranieli); Count VII (Negligence as against Jerry Ranieli); Count VIII (Breach of Contract as against the Marranca Defendants; Count IX (Negligence as against the Marranca Defendants); Count X (Breach of Contract as against Midlantic); and Count XI (Negligence as against Midlantic). *Id.* After the parties engaged in discovery, all defendants except Ranieli have filed motions for summary judgment. In total, there are five pending motions for summary judgment before the Court—brought by Pocono (Doc. 215), Patrick McLaine and Civil Design Partners (the "McLaine Defendants") (Doc. 219), Balchune (Doc. 217), the Marranca Defendants (Doc. 202), and Midlantic (Doc. 210).

To make matters more complicated, all defendants (with the exception of Jerry Ranieli) have filed crossclaims against other defendants in this case. *See* Docs. 161 (Pocono's Answer and Crossclaims), 200 (Midlantic's Answer and Crossclaim), 201 (Marranca Defendants' Answer and Crossclaims), 212 (Balchune's Answer and Crossclaims), 224 (McLaine Defendants' Answer and Crossclaims). However, since the

7

filing of their answer, the McLaine Defendants have dropped their crossclaims. See e.g. Doc. 265 at 1(stating that "[a]fter analysis, CDP and McLaine do not believe they have valid crossclaims against any defendant, and hereby withdraw them").

None of the crossclaims allege specifically allege any acts or omissions that could support of a finding of breach of contractual duties, breach of other legal obligations, or breach of any duties sounding in tort. See e.g. Doc. 200, at 16-17 (Midlantic's crossclaim alleging only that if Plaintiff sustained damages, then all other defendants "are primarily liable" and "are liable to Midlantic [] by way of contribution and/or indemnity."); Doc. 201, ¶¶ 130, 132 (Marranca Defendants' crossclaim alleging that "to the extent that there are defects or deficiencies in the concrete at the Drop Lot, such were caused by the acts and omission of one or all of the other Defendants…" and that they are "entitled to contribution" from other defendants); Doc. 212, at 11-12 (Balchune's crossclaim alleging that to the extent New Prime suffered damages, "said damages were not caused by any act or omission of Balchune and, instead, were caused by [other defendants]," who are liable to Balchune "for contribution and/or indemnity"); Doc. 161, at 16-17 (Pocono's crossclaim alleging that "to the extent there are defects or deficiencies in the concrete at the Drop Lot, such defects or deficiencies were caused by the actions of one or all of the other Defendants," and that "Pocono is entitled to contribution from [all other Defendants] for any damages assessed against Pocono").

The present opinion concerns the Midlantic's motion for summary judgment for (1) dismissal of plaintiff's breach of contract and negligence claims against Midlantic, (2) dismissal of other defendants' crossclaims against Midlantic, and (3) judgment in Midlantic's favor on its crossclaim against Balchune for contractual indemnification. Doc. 210. For reasons stated below, the Court will deny the motion for summary judgment except with respect to Midlantic's crossclaim against Balchune, which will be granted in part and denied without prejudice in part.

## III. STANDARDS OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual

issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

### I. New Prime's Breach of Contract Claim Against Midlantic

New Prime has brought two claims against Midlantic—breach of contract and negligence. Doc. 156, Counts X, XI. Because New Prime is not a party to the contract between Balchune and Midlantic, it asserts that it is a third-party beneficiary to the contract. "[U]nder Pennsylvania law, 'in order for a third party beneficiary to have standing to recover on a contract, both contracting parties must have expressed an intention that the third-party be a beneficiary, and that intention must have affirmatively appeared in the contract itself.'" *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 168 (3d Cir. 2008) (citing *Scarpitti v. Weborg*, 609 A.2d 147, 149 (Pa. 1992)). The Pennsylvania Supreme Court has adopted § 302 of the Restatement (Second) of Contracts, which allows an "intended beneficiary" to recover for breach of contract. *Scarpitti*, 609 A.2d at 149-150. Under this theory, plaintiff must show "(1) the recognition of the beneficiary's right must be appropriate to effectuate the intention of the parties, and (2) the performance must satisfy an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Shumate v. Twin Tier Hosp., LLC*, 655 F. Supp. 2d 521, 535 (M.D. Pa. 2009) (internal citations omitted).

11

Midlantic "does not contest that Plaintiff is a third-party beneficiary of its agreement with Balchune," but rather, it disputes that its contractual obligations extended to reporting "any defects, deficiencies or non-conformities that it observed" during testing to either Balchune or New Prime. Doc. 229 at 14-15. Thus, the key question turns on whether the "benefit of the promised performance," i.e. the second prong of the third-party beneficiary test, includes the benefit of advising Balchune or New Prime of the alleged defects. Specially, New Prime argues that Midlantic should have notified either New Prime or Balchune that (1) the "use of PennDOT Class A concrete" was an inappropriate concrete choice, (2) the "spot checking" ordered by Balchune was "too infrequent and in violation of industry standards," and (3) "the concrete often did not meet quality control and PennDOT standards for Class A concrete, due to its excessive slump and low 7-day compressive strength." Doc. 276, at 19.

Midlantic contends that even if its testing had yielded "excessive slump and low 7-day compressive strength," as alleged by New Prime, it had "no contractual obligation to 'warn' Balchune of anything with respect to the concrete." Doc. 229, at 18. This argument practically writes the entire purpose of Midlantic's services out of the contract. If a construction contractor, like Balchune, hired Midlantic for its concrete testing and quality control services, it would be undoubtedly for the benefit of knowing when the testing results have yielded negative results. Contractors need not explicitly write in a provision asking a quality control firm to "warn" them about negative results in order to expect them to do so.

12

Midlantic also argues that because the contract does not explicitly include a provision regarding concrete selection, it is not obligated to "alert Balchune that the type of concrete [selected by Balchune] was inappropriate." *Id.* at 10. It further argues that Midlantic is not obligated to notify anyone of the "poor construction practices performed by Balchune" because it was "not hired to supervise Balchune's construction crews." *Id.* While it is true that the revised proposal does not specifically state that Midlantic must make recommendations on concrete type or construction specifications, the revised proposal does state that Midlantic was to provide "[w]ritten reports of our observations, testing activities, and *recommendations*." Doc. 211-6, at 1 (emphasis added). Midlantic conveniently ignores this provision in its opening brief, instead blithely asserting that "Midlantic was not asked to provide any recommendations on the project." Doc. 229, at 3. Thus the Court is without elucidation as to what the "recommendations" or "written reports" were to include. From the adjacent provisions in the revised proposal, it appears that these written reports and recommendations would concern Midlantic's testing for "various soil types used in the fill or proposed for use in the fill" and Midlantic's "observation of soil and aggregate fill placement and field density testing...to evaluate if earthwork compaction is obtained in accordance with the project specifications." Doc. 211-6, at 1. Midlantic also purported to provide "on-site testing and observation of concrete including slump, temperature, percent entrained air..." as well as "on-site testing and observations of asphalt placement." *Id.* at 2. These provisions would suggest that Midlantic was obligated to not only test the concrete, but also

13

the concrete installation and placement methods  However, the terms at least leave some room for interpretation, as they do not contain explicit references to "concrete type" or concrete construction methods.

When the terms of a contract are ambiguous, the Court may look extrinsic or parol evidence to determine the intent of the parties. *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008). "A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* In this case, however, the extrinsic evidence is of no use in determining the exact scope of Midlantic's obligations. New Prime's expert opined that Midlantic "purported to have relevant experience and expertise with concreting industry practices," and that Midlantic was "in a position to comment on appropriate concrete types for use on the Drop Lot project but failed to do so." Doc. 211-10 ("Guedelhoefer Report"), at 9. These opinions appear to address Midlantic's general duties as a testing service in the construction industry, but do not address the interpretation of the revised proposal itself.

Midlantic's expert, on the other hand, did appear to address the revised proposal. However, he only concluded that because the revised proposal specifically excluded "review of the construction plans and specifications," Midlantic was not responsible for "the analysis and review of the design and the [] parameters [of the Drop Lot]." Doc. 211-12 (Durkin Report), at 7. This conclusion merely addresses the design and specification responsibilities of the Drop Lot project; it does not resolve whether Midlantic should have

14

provided recommendations as to the concrete type and construction methods. "While this Court may determine the existence of an ambiguity as a matter of law, [] the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact." *Windows v. Erie Ins. Exch.*, 161 A.3d 953, 958 (Pa. Super. Ct. 2017) (citing *Walton v. Philadelphia Nat'l Bank*, 545 A.2d 1383, 1389 (Pa. Super. Ct. 1988)). Given the technical nature of these provisions, the terms of the contract do not unambiguously resolve whether Midlantic's obligations to provide "written reports of our observations, testing activities, and recommendations" should have extended to recommendations of concrete type or construction methods. Furthermore, given the conflicting extrinsic evidence from various experts, the Court cannot rule as a matter of fact and law whether the revised proposal was breached. The Court will therefore deny summary judgment on the breach of contract claim.

## II.  New Prime's Negligence Claim Against Midlantic

Similarly, Midlantic's motion for summary judgment on the negligence claim against it must fail. In order to prevail on a cause of action of negligence in Pennsylvania, a plaintiff must establish: "(1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another." *Kleinknecht v. Gettysburg Coll.*, 989 F.2d

1360, 1366 (3d Cir. 1993) (citing *Morena v. South Hills Health Sys.*, 462 A.2d 680, 684 n. 5 (Pa. 1983));

The parties argue that the Court should determine whether a new duty should be created in this case based on five factors: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." Doc. 229, at 22 (citing *Althaus v. Cohen*, 756 A.2d 1166, 1168-69 (Pa. 2000)); Doc. 276, at 21-22 (same). They then proceed to apply each of the five factors to Midlantic, an engineering firm providing services for the benefit of New Prime, a third party. Doc. 229, at 22-25; Doc. 276, at 21-25.

However, both parties have missed the point of the *Althaus* factors, which should only be applied when the court is contemplating the creation of *new* duties. As the Pennsylvania Supreme Court recently explained:

> As to the aspects of this litigation centered on the *Althaus* factors, we find these to be more relevant to the creation of new duties than to the vindication of existing ones. It is not necessary to conduct a full-blown public policy assessment in every instance in which a longstanding duty imposed on members of the public at large arises in a novel factual scenario.

*Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co.*, 106 A.3d 27, 40 (Pa. 2014). In this case, Court need not create a new duty based in tort, as the proper analysis for liability should be under Section 552 of the Restatement (Second) of Torts, entitled Information Negligently Supplied for the Guidance of Others, which provides:

16

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552 (1977). As the Comments clarify, Section 552

limits the scope of liability by "subject[ing] the negligent supplier of misinformation to liability

*only* to those persons for whose benefit and guidance it is supplied." Restatement (Second)

of Torts § 552, Comment H (emphasis in original). The Pennsylvania Supreme Court has

formally adopted Section 552 in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866

A.2d 270 (Pa. 2005):

> We are persuaded by these decisions from our sister jurisdictions that: (1) this Court should formally adopt Section 552 of the Restatement (Second), which we have cited with approval in the past, as applied by those jurisdictions in the architect/contractor scenario; (2) there is no requirement of privity in order to recover under Section 552; and (3) the economic loss rule does not bar recovery in such a case.

*Id.* at 285. The *Bilt-Rite* court went on to explain its reasoning as to design professionals:

> "[W]e see no reason why Section 552 should not apply to architects and other design professionals... An architect, in the performance of his contract with his employer, is required to exercise the ability, skill, and care customarily used by architects upon such projects... Accordingly, we hold that an architect in the absence of privity of contract may be sued by a general contractor or the subcontractors working on a construction project for economic loss foreseeably resulting from breach of an architect's common duty of due care in the performance of his contract with the owner."

*Id.* at 286. Not only did *Bilt-Rite* reference "engineers" as design professionals in its reasoning, *id.* at 285, cases that cite *Bilt-Rite* have also taken to apply Section 552 liability to engineers. *See e.g. Integrity Carpet Cleaning, Inc. v. Bullen Companies*, 2011 WL 31397, at *4 (E.D. Pa. Jan. 5, 2011) (stating that *Bilt-Rite*'s "decision apply only to architects, engineers, and other professionals who supply specific and unique information for use by others in their business dealings."); *Gongloff Contracting, L.L.C. v. L. Robert Kimball & Assocs., Architects & Engineers, Inc.*, 119 A.3d 1070, 1080–81 (Pa. Super. Ct. 2015) (holding that "allegations that [engineering firm's] design documents constituted negligently-supplied false information have been pled with the appropriate level of specificity to state a cause of action for negligent misrepresentation under Section 552 of the Restatement (Second) of Torts").

Midlantic, an engineering firm that provides inspection services, is undoubtedly in the profession of supplying "information for the guidance of others in their business transactions." Its revised proposal stated that it will provide "geotechnical inspection and testing services" and "structural inspection and testing services including testing and

18

observation of concrete." Doc. 211 ¶ 17. It also agreed to provide testing "related to subgrade preparation and concrete placement test, spot check testing of the concrete as delivered...and reporting the results of the testing." *Id.* ¶ 22. Therefore, the core nature of Midlantic's business is to provide information (i.e. testing results and recommendations) "for the guidance of others." Thus, Midlantic may be liable under Section 552 if it negligently supplied misleading or inaccurate information by failing to "exercise reasonable care or competence in obtaining or communicating the information." Restatement (Second) of Torts § 552 (1977).

New Prime is within the class of plaintiffs that may bring a claim against Midlantic. Section (2) of Section 552 restricts liability to the loss suffered by the person "for whose benefit and guidance he intends to supply the information" and "through reliance upon it [the defendant] intends the information to influence or knows that the recipient so intends..." *Id.* As stated above, Midlantic concedes that New Prime is a third party beneficiary to the revised proposal. New Prime has argued that it has suffered economic damages due to its reliance on Midlantic's expertise, and that it "is a trucking company, not a construction or concrete company, and relied at all times on the skill and expertise" of various defendants, including Midlantic. Doc. 276, at 6. Midlantic concedes that it was aware that its inspection services were to assist in the proper construction of the Drop Lot, which was commissioned by New Prime. Doc. 211 ¶¶ 1-3. Therefore, Midlantic knew that it was for New Prime's benefit and guidance that Midlantic supplied the information.

While New Prime's claim is generically stated as one for "negligence" (Doc. 156,

Count XI), the allegations state that New Prime and Balchune were not only relying on

Midlantic to provide geotechnical inspection and testing services, but also "to ensure that *all*

*relevant information* was disclosed relating to defects, deficiencies, or non-conformities in

both the concrete and in the work being performed on the Trailer Drop Lot to Balchune,

Plaintiff, and others so that appropriate corrective measures would be taken." Doc. 156 ¶

111. New Prime's expert Guedelhoefer opined that Midlantic was "in a position to comment

on appropriate concrete types for use on the Drop Lot project but failed to do so." Doc. 211-

10, at 9. In addition, expert Rajabipour opined that Midlantic should have warned Balchune

that testing only one concrete truck per day was too infrequent and in violation of industry

standards. Doc. 277 ¶ 133 (citing Rajabipour Report, at 6-10). There is also evidence that

Midlantic's testing results yielded subpar quality control industry standards due to the

concrete's "excessive slump and low 7-day compressive strength," and that Midlantic did

not apprise Balchune of these results. Rajabipour Report, at 14, 21.[2] Thus, there is a

genuine issue of fact as to whether Midlantic was negligently misleading or inaccurate in the

---

[2] Though none of the parties briefed the issue, the Court notes that the negligence claim here would not be barred by the gist of an action doctrine, which prohibits a party from "bring[ing] a tort claim for what is, in actuality, a claim for a breach of contract." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60 (Pa. 2014). As *Bruno* found, the doctrine distinguishes "a failure to perform," which is a breach of contract action, from "a failure to perform in a workmanly manner, which is a tort..." *Id.* at 63 (citing *Zell v. Arnold*, 2 Pen. & W. 292, 1830 WL 3261 (Pa.1830)). Because New Prime does allege Midlantic's failure "to perform its work in a good and workmanlike manner" under its negligence claim (Doc. 156 ¶ 108) and because its experts offer evidence that Midlantic's quality control testing and the concrete testing results were below industry standards (Rajabipour Report, at 21), New Prime's negligence claim is not barred by the gist of the action doctrine.

reports of its observations and recommendations to Balchune. That, however, is where the

Court's determinations must end. The conflicting parol and expert evidence before the

Court renders it impossible to determine whether Midlantic *in fact* breached a duty of care to

New Prime. The motion for summary judgment on the negligence claim will be denied. [3]

### III.    Other Defendants' Crossclaims Against Midlantic

All moving defendants have brought crossclaims against other defendants. While

the McLaine Defendants have since dismissed their crossclaims, Balchune, Pocono, and

the Marranca Defendants' crossclaims against Midlantic for contribution or indemnity remain

pending. *See* Doc. 201 ¶¶ 130, 132 (Marranca Defendants' crossclaims for contribution

against "one or all of the other Defendants..."); Doc. 212, at 11-12 (Balchune's crossclaims

for "contribution and/or indemnity" against the McLaine Defendants, Pocono, and Midlantic);

Doc. 161, at 16-17 (Pocono's crossclaims for contribution against all other Defendants).

Midlantic argues in passing that the crossclaims against it should be dismissed

because the McLaine Defendants and the Marranca Defendants "concur in the relief

requested in the within motion and, therefore, their crossclaims against Midlantic should be

dismissed as a matter of law." Doc. 229, at 25. This is a nonsensical claim. While the

Local Rules require that every motion contain a certification of concurrence or

nonconcurrence, another party's concurrence to a motion does not mean that party concurs

---

[3] Pocono, which has a crossclaim against Midlantic, has filed an opposition to this motion. However, instead of briefing its own crossclaims against Midlantic, Pocono steps in the shoes of New Prime and argues why *New Prime*'s claims should survive. For reasons stated above, New Prime's claims against Midlantic will not be dismissed. Thus the Court need not address Pocono's opposition brief.

in all substantive relief requested in that motion. M.D.Pa. Local Rule 7.1. While analyzing

Local Rule 7.1 in a criminal case, the Third Circuit has said that a criminal defendant's

"concurrence did not rise to the level of an unequivocal agreement; it merely complied with

a local court rule... the Rule is a procedural mechanism to expedite the business of the

court ... In no way can we see how the concurrence can be construed to rise to the level of

an agreement or a bargained-for exchange." *United States v. Stansfield*, 171 F.3d 806, 813

(3d Cir. 1999). *Stansfield*'s reasoning is equally applicable here. While the McLaine

Defendants and the Marranca Defendants concurred in Midlantic's motion, their

concurrence cannot be read as to estop their crossclaims against Midlantic, especially since

Midlantic's motion only cursorily referred to the crossclaims by other defendants. This is

particularly true since the McLaine Defendants, having concurred in Midlantic's motion,

nevertheless filed an opposition to it. Doc. 261.[4]

    With respect to Pocono and Balchune's crossclaims against it, Midlantic merely

states that "[f]or the reasons set forth in the prior section of this Brief [involving New Prime's

claims], Midlantic maintains that these Defendants cannot maintain their crossclaims." Doc.

229, at 25-26. Midlantic cannot escape its briefing responsibilities with such superficial

treatment. The legal analysis of those crossclaims is not coextensive with the legal analysis

---

[4] The Court, however, need not address the merits of the McLaine Defendant's opposition, which only argues that Midlantic's crossclaim against them should be dismissed. Doc. 261, at 4 (presenting the relevant issue as "Whether Midlantic Engineering, Inc. has a valid crossclaim against CDP and/or McLaine" and suggesting an answer in the negative). While Midlantic argues that its crossclaim against Balchune should be granted due to a contractual relationship between them, Midlantic does not move as to its crossclaim against the McLaine Defendants. Thus, Midlantic's crossclaims against the McLaine Defendants cannot be properly resolved on the instant motion.

22

of New Prime's claims, not in the least because Midlantic's relationships with Balchune or Pocono are wholly distinct from its relationship with New Prime. In the Third Circuit, "a passing reference to an issue will not suffice to bring that issue before this court." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 202–03 (3d Cir. 2004). *See also John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n. 6 (3d Cir. 1997) ("arguments raised in passing...but not squarely argued, are considered waived"). Thus, the Court will not address the crossclaims against Midlantic brought by the other defendants. Midlantic's one paragraph "argument" fails to persuade the Court that the crossclaims must be dismissed as a matter of fact and law. To the extent that Midlantic is able to rely on any portion of its argument for New Prime's claims, those arguments fail for the same reasons.

## IV. Midlantic's Indemnity Crossclaim Against Balchune

Finally, Midlantic argues that it is entitled to summary judgment on its affirmative crossclaim against Balchune for contractual indemnification. Doc. 229, at 26. The revised proposal contains mirroring indemnification clauses between Balchune and Midlantic, each agrees to indemnify against the other for damages caused by the indemnifying party's "negligent acts, errors or omissions and those of his or her contractors." Doc. 211-1, at 7. Specifically, Balchune agreed that:

> "to the fullest extent permitted by law, to indemnify and hold Midlantic harmless from any damage, liability or cost (including reasonable attorneys' fees and costs of defense) to the extent caused by the Client's [Brandon Balchune Construction, Inc.'s] negligent acts, errors or omissions and those of his or her contractors, subcontractors or consultants or anyone for whom the

23

Client [Brandon Balchune Construction, Inc.] is legally liable, and arising from the project that is the subject of this Agreement."

*Id.* Midlantic, in turn, agreed to indemnify Balchune under a virtually identical provision. Midlantic now argues that the Court must give full effect to the indemnification provision as it applies to Balchune (though Midlantic surreptitiously left out the fact that it has agreed to indemnify Balchune for the same types of acts and omissions). Midlantic essentially requests a declaration from this Court that "Balchune is required to indemnify and hold harmless Midlantic from any damage, liability or costs…to the extent caused by the negligence of Balchune and those of its contractors…" Doc. 229, at 28. Balchune opposes Midlantic's motion with three arguments: (1) that Midlantic has not alleged Balchune to be negligent, (2) that he did not actually sign the revised proposal, and (3) that 68 P.S. § 491, Pennsylvania's "anti-indemnification" statute, invalidates all indemnification clauses involving engineering services. The Court will address each in turn.

First, while it is true that "[t]here are no allegations of negligence set forth against Balchune" in the Second Amended Complaint (Doc. 279, at 7), the analysis does not stop there. The indemnification provision provides that Balchune will indemnify Midlantic not only for its own "negligent acts, errors or omissions," but also "those of his or her contractors, subcontractors or consultants or anyone for whom the Client [Brandon Balchune Construction, Inc.] is legally liable." The Second Amended Complaint alleges negligence against Defendant Jerry Ranieli, who is alleged to be a subcontractor of Balchune hired "to serve as its site superintendent for the Drop Lot project," as well as the Marranca

24

Defendants, who are alleged to be hired by Balchune as "Site Manager for the project."

Doc. 156 ¶¶ 18, 19. Thus, Balchune may very well be liable for indemnification for the

negligent acts of his subcontractors.

Second, Balchune's argument that he did not personally "sign" the revised proposal

is without merit. While the revised proposal only has a typed line: "Accepted: Balchune

Construction, Inc.," and does not show a hand signature (Doc. 211-6 at 4), that does not

wash Balchune of all responsibility. "The law of this Commonwealth makes clear that a

contract is created where there is mutual assent to the terms of a contract by the parties

with the capacity to contract." *Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor*

*Control Bd.*, 739 A.2d 133, 136 (Pa. 1999). "As a general rule, signatures are not required

unless such signing is expressly required by law or by the intent of the parties." *Id.* "In

determining the parties' intentions concerning the [agreement at issue], we must examine

the entire document and the relevant circumstances surrounding its adoption." *Channel*

*Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986).

It is clear that Midlantic and Balchune intended to be bound by the revised proposal,

as Midlantic proceeded to provide inspection and testing services after Balchune received

the proposal. Doc. 211 ¶¶ 15, 24. In return, Midlantic received $6,674.00 for its services.

*Id.* ¶ 156. There is nothing in the record that would indicate that the parties intended to be

bound *only* if Balchune signed the contract. In fact, both parties performed in accordance

25

with the contract shortly after the revised proposal was created. *Id.* ¶¶ 15-18, 23-24,151, 156.

In any event, even if the parties' mutual assent to the revised proposal was truly a disputed issue of fact, the Court would deny summary judgment on the grounds that the intent of the parties should be left to the factfinder. *McGoldrick v. TruePosition, Inc.*, 623 F. Supp. 2d 619, 627 (E.D. Pa. 2009) (denying summary judgment because "[c]learly there is a dispute as to what the intentions of the each party were...Additionally, whether the documents that have the appearance of contracts 'may be in fact evidence of mere negotiation by parties' is generally a question for a factfinder") (citing *Goldman v. McShain,* 432 Pa. 61, 68–69, 247 A.2d 455 (Pa.1968)).

Finally, Balchune argues that Pennsylvania's "anti-indemnification" statute, 68 P.S. § 491, "renders some indemnification clauses in contracts involving engineering services unenforceable." Doc. 279, at 6. The rarely cited statute, enacted in 1970, has only been cited in three Pennsylvania cases, the most substantive of which is a Third Circuit case, *Valhal Corp. v. Sullivan Associates, Inc.* 44 F.3d 195 (3d Cir. 1995). The Third Circuit quoted the relevant part of the statute as follows:

> Every covenant, agreement or understanding ... in connection with any contract or agreement made and entered into by owners, contractors, subcontractors or suppliers whereby an architect ... or his[/her] agents ... *shall be indemnified or held harmless* for damages ... arising out of: (1) the preparation or approval by an architect ... or his[/her] agents ... of ... opinions, reports, ... or specifications, or (2) the giving or the failure to give directions or instructions by the architect ... Or his[/her] agents ... Shall be void as against public policy and wholly unenforceable.

*Id.* at 204 (citing 68 P.S. § 491) (emphasis in original). The Third Circuit held that the statute did not prohibit limitation of liability clauses, i.e. a contractual clause that caps damages at a certain amount. In so holding, the court noted the significance of the fact that the case concerned a private, commercial, and arm's length contract:

> We are persuaded that limitation of liability clauses are not disfavored under Pennsylvania law; especially when contained in contracts between informed business entities dealing at arm's length, and there has been no injury to person or property.

*Id.* at 203-04 (internal citation omitted).

While *Valhal*'s narrow holding concerns limitation of liability clauses, which places a limit on the amount of liability, the Court finds that the underlying reasoning of *Valhal* is applicable in this case. As *Valhal* noted at the outset, there are similarities between limitation of liability clauses and indemnity clauses:

> Those clauses are disfavored and must meet certain conditions to be enforceable. First, the clause must not contravene public policy. Second, the contract must relate solely to the private affairs of the contracting parties and not include a matter of public interest. Third, each party must be a free bargaining agent. In addition, an exculpatory or indemnity clause will still not be enforced unless it is clear that the beneficiary of the clause is being relieved of liability only for his/her own acts of negligence."

*Id.* at 202. In this case, the indemnification clauses are part of a private, arm's length contract between two sophisticated parties in the industry. The fact that the indemnification clauses are bilateral against both parties shows that it is a bargained-for contract. The indemnification clauses relate solely to the private affairs between Balchune and Midlantic.

And the clauses only relieve liability for the indemnifying party's own or their agents' negligence. Thus, there is no reason to conclude that either Balchune or Midlantic can use the statute to "elevate its private contracts to matters of public concern" in order to invalidate the indemnification clauses. *Id.* at 207.

Applying the logic of *Valhal*, the bilateral indemnification clauses at issue are not a matter of public concern such that they should be *per se* barred by 68 P.S. § 491. However, the Court is in no way expressing an opinion as to whether Balchune should *in fact* indemnify Midlantic, as the parties have not argued the issue of whether Balchune's subcontractors were actually negligent on this motion for summary judgment. Nor have the parties briefed the issue of whether *Midlantic* should indemnify *Balchune* in accordance with the mutual indemnification clauses; that question will depend upon whether Midlantic will be found negligent at trial. Thus, the degree to which Balchune and Midlantic will be liable to each other will ultimately be left to the jury.

## V. CONCLUSION

For the reasons outlined above, Midlantic's motion for summary judgment (Doc. 210) will be denied except with respect to Midlantic's crossclaim against Balchune, which will be granted in part and denied without prejudice in part. A separate Order will follow.

Robert D. Mariani
United States District Judge

28