# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NEW PRIME, INC.,

    Plaintiff,

v.

3:14-CR-2410
(JUDGE MARIANI)

BRANDON BALCHUNE
CONSTRUCTION, INC., POCONO
TRANSCRETE, INC., PATRICK
MCLAINE, P.E., CIVIL DESIGN
PARTNERS, INC., JERRY RANIELI,
SAMUEL J. MARRANCA, SAMUEL J.
MARRANCA GENERAL CONTRACTING
CO., MIDLANTIC ENGINEERING, INC.

    Defendants.

## MEMORANDUM OPINION

### I. INTRODUCTION

This case concerns the construction of a defective concrete parking lot, for which plaintiff has brought claims against seven defendants, all of whom were contractors or subcontractors for the construction project. Plaintiff has alleged eleven counts for breaches of contract, breaches of implied warranties, and negligence relating to the construction. Presently before the Court are five motions for summary judgment brought by defendants against plaintiff. For sake of clarity, the Court will address each of the five motions in a separate opinion, though the underlying facts of the case remain substantively the same.

This opinion concerns Defendants Patrick McLaine and Civil Design Partners Inc. (the "McLaine Defendants")'s motion for summary judgment as to plaintiff's breach of contract and breach of warranty claims against them. Doc. 219.

## II. STATEMENT OF UNDISPUTED FACTS

The McLaine Defendants have submitted a Statement of Material Facts as to which they argue there is no genuine issue or dispute for trial. Doc. 221. Plaintiff submitted an opposition to the motion and an answer to the Statement of Facts. Docs. 283, 284. The following facts are not reasonably in dispute except as noted.

Plaintiff, New Prime, is a corporation that hired various entities to construct a new parking lot (the "Drop Lot"). Doc. 221 ¶¶ 1, 10-15. New Prime hired the McLaine Defendants to create several documents in the process of obtaining governmental permits for the Drop Lot. *Id.* ¶ 18. In particular, the McLaine Defendants were hired to "generate and submit a land development plan for the purpose of complying with the ordinances and permit requirements" of local authorities. *Id.* ¶ 15. The Land Development Plan was to contain "sufficient information to obtain those governmental permits and approvals." *Id.* ¶ 16. It is undisputed that the Plan did not contain any "references to concrete" except the specification that the construction was to use "Class A concrete for the curbing [of the Drop Lot construction], and eight inch thick concrete slabs upon a ten inch sub-base, and a compacted sub-grade." *Id.* ¶ 17.

In August 2012, New Prime hired Brandon Balchune Construction, Inc. ("Balchune"),

a construction company, as the general contractor for the Drop Lot. Doc. 221 ¶ 11; Doc. 221-6. Balchune in turn hired Defendant Jerry Ranieli to serve as the site superintendent. Id. ¶ 14. Defendant Pocono Transcrete, Inc. ("Pocono") supplied the concrete for the construction, while Defendant Midlantic Engineering, Inc. ("Midlantic") provided quality control and inspection services for the construction. Id. ¶¶ 12-13.[1]

The McLaine Defendants did not enter into a formal contract with New Prime, but rather, agreed to proceed based upon an email exchange, which the parties treated as the contract between them. Id. ¶¶ 15, 18; Doc. 221-1. However, neither the McLaine Defendants nor New Prime attached the *entire* email thread to their motion papers, but rather, only included the first page of the email. Docs. 221-1, 284-3. At the bottom of the first page, the remaining text of an April 26, 2012 email sent from Patrick McLaine to Johnnie Madison (a New Prime employee) is cut off. Id. The latter part of the April 26, 2017 email, or any emails preceding it, is not included in the record.

In accordance with the email that served as a contract between them, the McLaine Defendants prepared the following documents: the Land Development Plan, "an erosion and sediment plan for the Luzerne Conservation District, a general NPDES permit for the

---

[1] While New Prime disputes the assertion that "Defendant Midlantic is the testing company" for the Drop Lot project, doc. 284 ¶ 13, it is unclear why it raises the dispute. In its denial, New Prime pointed the Court to the Revised Proposal between Midlantic and Balchune, which states it will provide "Construction Inspection and Materials Testing Services" for the "Prime, Inc. Trucking" project. Doc. 284-7, at 1. Furthermore, New Prime does not dispute that Midlantic is a company that provides "testing, quality control, and analysis of the strength, durability and workability of concrete in connection with concrete-related construction and installations for projects like the Trailer Drop lot at issue in this case." Doc. 221 ¶ 9. There is therefore no dispute over the fact that Midlantic provided testing services for the Drop Lot. In any event, the exact role of Midlantic is irrelevant for the purposes of this motion.

3

Luzerne Conservation District and DEP, and a PP&L encroachment application." Doc. 221 ¶ 18. The McLaine Defendants submitted their plans to Ron Slone, New Prime's architect, and Johnnie Madison, the New Prime employee in charge of overseeing the project. Id. ¶ 20. Neither communicated any deficiencies in the plans to the McLaine Defendants. Id. Citing deposition testimony of Richard Yarborough, the McLaine Defendants contend that Johnnie Madison and a firm called Killian Construction were responsible for developing the general bid specifications for the Drop Lot project, and that the specifications were not provided to the McLaine Defendants. Id. ¶ 21. The McLaine Defendants further aver that Mr. Madison and Killian Construction later changed the "sub-base" specification without the knowledge of the McLaine Defendants. Id. ¶ 22. New Prime, however, disputes these statements, stating that the deposition testimony of Richard Yarborough was mischaracterized. Rather, Yarborough only testified that he "is not sure who developed the blueprints [or bid specifications]." Doc. 284 ¶ 21. New Prime also disputes that the "sub-base" specifications were changed without the knowledge of the McLaine Defendants, but cites nothing in the record or provides any explanation in support of this denial. Id. ¶ 22. Furthermore, both parties have failed to inform the Court who Mr. Yarborough is and what role he played in the construction of the Drop Lot. But the Court was able to glean from its own review of the record that he is a "terminal manager" for New Prime who would be familiar with the Drop Lot project, and that he testified that he has no knowledge of who prepared the bid specifications. Doc. 284-2, at 9:18-11; Doc. 221-4, at 2.

The McLaine Defendants also contend that they "were never asked to generate, and never agreed to provide, construction specifications." Doc. 221 ¶ 24. This, again, is disputed by New Prime, who avers that "Civil Design failed to specify the required quality of concrete…and required methods of quality control" in the Land Development Plan. Doc. 284, ¶ 24. This denial, however, does not resolve the fundamental question: which is whether the McLaine Defendants were *asked to generate or provide* such specifications. As discussed above, the actual contract between New Prime and McLaine Defendants consists of a single email thread, of which the Court only has the first page. Docs. 221-1, 284-3. The bottom email of the first page is from Patrick McLaine, listing a partial list of draft terms for a "proposal for the permitting and approvals of the trailer parking area." *Id.* There is no indication whether this "proposal" refers to the Land Development Plan or another document. Furthermore, the response from New Prime to McLaine's email merely states "Patrick[,] go ahead on the project." *Id.* McLaine then responded to New Prime, in relevant part: "We started. Similar to the topographic survey and the NPDES Major Modification, hopefully we can come in under budget." *Id.*

### III. Procedural History

On December 22, 2014, New Prime filed its original complaint naming Balchune and Pocono as defendants. Doc. 1. On August 10, 2015, New Prime filed an Amended Complaint adding the McLaine Defendants, Jerry Ranieli, Samuel J. Marranca, and Samuel

5

J. Marranca General Contracting Company as defendants. Doc. 36.² On July 13, 2016, New Prime filed the Second Amended Complaint (which is the operative complaint for this motion), adding Midlantic as a defendant. Doc. 156.

The Second Amended Complaint contains eleven counts as follows: Count I (Breach of Contract as against Balchune); Count II (Breach of Warranty as against Balchune); Count III (Breach of Warranty as against Pocono); Count IV (Breach of Contract as against Patrick McLaine and Civil Design Partners); Count V (Breach of Warranty as against Patrick McLaine and Civil Design Partners); Count VI (Breach of Contract as against Jerry Ranieli); Count VII (Negligence as against Jerry Ranieli); Count VIII (Breach of Contract as against the Marranca Defendants; Count IX (Negligence as against the Marranca Defendants); Count X (Breach of Contract as against Midlantic); and Count XI (Negligence as against Midlantic). *Id.* After the parties engaged in discovery, all defendants except Ranieli have filed motions for summary judgment. In total, there are five pending motions for summary judgment before the Court—brought by Pocono (Doc. 215), the McLaine Defendants (Doc. 219), Balchune (Doc. 217), the Marranca Defendants (Doc. 202), and Midlantic (Doc. 210).

To make matters more complicated, all defendants (with the exception of Jerry Ranieli) have filed crossclaims against other defendants in this case. *See* Docs. 161 (Pocono's Answer and Crossclaims), 200 (Midlantic's Answer and Crossclaim), 201

---

² On the same day, Balchune filed a "Joinder Complaint" against Midlantic. Doc. 37. The Joinder Complaint was dismissed on May 5, 2017 following New Prime's addition of Midlantic as a named defendant.

6

(Marranca Defendants' Answer and Crossclaims), 212 (Balchune's Answer and Crossclaims), 224 (McLaine Defendants' Answer and Crossclaims). However, since the filing of their answer, the McLaine Defendants have dropped their crossclaims. *See e.g.* Doc. 265 at 1(stating that "[a]fter analysis, CDP and McLaine do not believe they have valid crossclaims against any defendant, and hereby withdraw them").

None of the crossclaims allege specifically allege any acts or omissions that could support of a finding of breach of contractual duties, breach of other legal obligations, or breach of any duties sounding in tort. *See e.g.* Doc. 200, at 16-17 (Midlantic's crossclaim alleging only that if Plaintiff sustained damages, then all other defendants "are primarily liable" and "are liable to Midlantic [] by way of contribution and/or indemnity."); Doc. 201, ¶¶ 130, 132 (Marranca Defendants' crossclaim alleging that "to the extent that there are defects or deficiencies in the concrete at the Drop Lot, such were caused by the acts and omission of one or all of the other Defendants..." and that they are "entitled to contribution" from other defendants); Doc. 212, at 11-12 (Balchune's crossclaim alleging that to the extent New Prime suffered damages, "said damages were not caused by any act or omission of Balchune and, instead, were caused by [other defendants]," who are liable to Balchune "for contribution and/or indemnity"); Doc. 161, at 16-17 (Pocono's crossclaim alleging that "to the extent there are defects or deficiencies in the concrete at the Drop Lot, such defects or deficiencies were caused by the actions of one or all of the other

Defendants," and that "Pocono is entitled to contribution from [all other Defendants] for any damages assessed against Pocono").

The present opinion concerns the McLaine Defendants' motion for summary judgment, which argues that there is no evidence that their contractual obligations to New Prime included the obligation to provide concrete construction specifications. Doc. 219. For reasons stated below, the Court will deny the McLaine Defendants' motion for summary judgment.

### III. STANDARDS OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, ...[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual

issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

### I. Breach of Contract Claim Against the McLaine Defendants

New Prime has brought two claims against the McLaine Defendants—breach of contract and breach of warranty. Doc. 156, Counts IV, V. Specifically, New Prime alleges that the McLaine Defendants were contractually obligated to provide specifications "for the design and construction of the Drop Lot, including the materials used therein," and breached a warranty of its product (the plans and documents created by the McLaine Defendants) by providing "inadequate construction and design specifications and standards for the Drop Lot." Doc. 156 ¶¶ 64, 73. The McLaine Defendants counter that they "were never asked to generate, and never agreed to provide, construction specifications." Doc. 221 ¶ 24. In other words, the parties do not dispute that they entered into a contract to "generate and submit a land development plan." Doc. 221 ¶ 15. Rather, they dispute whether the land development plan was to include construction specifications for "the required quality of concrete (i.e. concrete type and target slump and strength) and required methods of quality control, testing, constriction, and curing of concrete as required by civil engineers for projects of this magnitude." Doc. 284 ¶ 24.

In Pennsylvania, a breach of contract claim requires "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates*

*Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). When interpreting the terms of a contract, a court should "ascertain and give effect to the intent of the contracting parties." *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008) (citing *Murphy v. Duquesne University*, 777 A.2d 418, 429 (2001)). "Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.*

The "contract" in this case is a single email exchange from a New Prime employee (Johnny Madison) and Patrick McLaine. Only the first page of the email thread is produced to the Court, and it contains no language imposing or exempting the McLaine Defendants from the obligation to provide construction specifications. Perhaps recognizing their error in only submitting the first page of the "contract" at issue, the McLaine Defendants purported to include the entire contents of the email thread in the "Facts" section of its reply brief. However, the inclusion is unsupported by the Statement of Facts, exhibits to the motion papers, or any other portion of the record. The Court will not deem the purported email contents in the reply brief to be admitted facts, since they are not supported by the record. Furthermore, even if the Court were to rely on what is represented in the McLaine reply brief, the contents do not provide any clarity on the McLaine Defendants' obligations to provide construction specifications. Instead, the additional portion of the email thread only includes McLaine's original email to New Prime, stating: "We have started the design and

11

preparation of the permit documents." There is no indication whether such "permit documents" should have included construction specifications. In other words, the woefully deficient email "contract" failed to include almost all key terms to the parties' agreement, including price, duration, or the exact scope of the McLaine Defendants' obligations. Instead, the email merely referred to a proposal "for the permitting and approvals of the trailer parking area [Drop Lot]." Doc. 221-1, at 1.

In order to buttress their own interpretation of the "contract," both parties point to extrinsic evidence in order to clarify the scope of contractual obligations. New Prime points out that the Land Development Plan generated by the McLaine Defendants includes a provision stating "All work shall be performed in accordance with these plans, specifications, referenced documents and the requirements and standards of the local authority." Doc. 284, at 9 (citing Doc. 221-2, at 4). New Prime argues that this provision suggests that the Plan itself purports to include all plans and specifications for the Drop Lot's contractors. It also points out that the Plan specified that Class A Concrete should be used for "Plain Concrete Curbing," which New Prime interprets to mean that the McLaine Defendants undertook the obligation to specify the type of concrete for the entire Drop Lot project. *Id.* (citing Doc. 221-2, at 6). Finally, New Prime points to the testimony of Jonnie Madison, the New Prime employee who was in contact with the McLaine Defendants regarding the Drop Lot project. Madison testified that he understood that the McLaine Defendants were obligated "to see the project out," by which he meant "to visit the project and make sure it

was going right." Doc. 284-5, at 61:3-17. He agreed that their responsibilities included "making sure the concrete was, in fact, the concrete that New Prime wanted on this job." He further testified that it was up to the "civil engineer, Pat McLaine...to tell the contractor what concrete to use." *Id.* at 40: 5-7. These extrinsic pieces of evidence, which only show that (1) the Plan provided a concrete type specification for the Drop Lot's curbing, and (2) Mr. Madison had a *personal* view of McLaine's contractual obligations, do not conclusively answer the question of what the parties intended when they entered into the contract in the first place.

The McLaine Defendants, on the other hand, argue that they were only hired to produce documents necessary to obtain local permits, and that New Prime did not communicate any deficiencies in the Land Development Plan to the McLaine Defendants after it was created. Doc. 232, at 10-11. But the fact that New Prime did not communicate any dissatisfaction with McLaine Defendants' services (until the time of this lawsuit) does not necessarily mean that McLaine Defendants performed all of their contractual obligations. The McLaine Defendants also rely on the testimony of Joseph Durkin, an expert retained by another defendant, Midlantic. Durkin testified that in his "experience," he would not "expect to see in land development plans detailed specifications as it relates to the installation of a 250,000 square foot parking lot." Doc. 232, at 10. This testimony is, at best, evidence of what is generally true in an industry expert's "experience." Durkin did not testify that he has reviewed the contractual terms between New Prime and the McLaine

13

Defendants, or is aware of any communications between the two parties. Thus, the selected portion of Durkin's testimony does not resolve the terms of the contract, since the parties could have bargained for terms that deviate from the industry norm.

"While this Court may determine the existence of an ambiguity as a matter of law, [] the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact." *Windows v. Erie Ins. Exch.*, 161 A.3d 953, 958 (Pa. Super. Ct. 2017) (citing *Walton v. Philadelphia Nat'l Bank*, 545 A.2d 1383, 1389 (Pa. Super. Ct. 1988)). There is ambiguity in the email contract as to what the documentation for the local permits required, and whether such requirements should have included the construction specifications that New Prime alleges were missing, such as "concrete type and target slump and strength" or "methods of quality control, testing, constriction, and curing of concrete." Doc. 284 ¶ 24. Because the contract does not expressly impose or preclude liability for the failure to provide construction specifications, and because there is conflicting parol evidence on the matter, the issue is best left to the trier of fact. The Court will deny summary judgment on the breach of contract claim.

**Breach of Warranty**

Next, the McLaine Defendants argue that the breach of warranty claim against them should be dismissed as a matter of law, because "in the context of construction plans and specification there can be no claim for breach of implied warranty under Pennsylvania law." Doc. 232 at 12 (citing *Alstom Power, Inc. v. RMF Indus. Contracting, Inc.*, 418 F.Supp.2d

14

766, 778 (W.D. Pa. 2006)). *Alstom*, however, only stated that "in the context of construction plans, specifications and/or request for quotation, the Court has found no authority to support such a claim for breach of implied warranty under Pennsylvania law. Therefore, the Court *predicts* that the Pennsylvania Supreme Court would decline to recognize a claim for breach of implied warranty based on construction plans, specifications, or request for quotation." *Id.* (emphasis added).

Yet, contrary to what the *Alstom* court found, there exists Pennsylvania case law that would impose breach of warranty liability on a contractor for deficient design specifications. *See e.g. City of Allentown v. O'Brien & Gere Engineers, Inc.*, 1997 WL 256050, at *22 (E.D. Pa. May 8, 1997) ("Pennsylvania law likewise provides a cause of action for breach of implied warranty of fitness for a particular purpose in commercial construction contracts... We further conclude, as did the other courts, that such implied warranties are also applicable to the design of the structure.") (internal citations omitted); *Hartford Fire Ins. Co. v. Associated Const. & Mgmt. Corp.*, 2000 WL 424273, at *11 (E.D. Pa. Apr. 19, 2000) ("Pennsylvania law provides, however, a cause of action for breach of implied warranties of fitness for a particular purpose in commercial construction contracts....and such implied warranties are also applicable to the design of the structure.") (collecting cases) (internal quotation marks omitted); *Bloomsburg Mills, Inc. v. Sordoni Const. Co.*, 164 A.2d 201, 203 (Pa. 1960) ("While an architect is not an absolute insurer of perfect plans, he is called upon to prepare plans and specifications which will give the structure so designed reasonable

fitness for its intended purpose, and he impliedly warrants their sufficiency for that purpose"); *Universal Mach. Co. v. Rickburn Enterprises, Inc.*, 1992 WL 180128, at *3 (E.D. Pa. July 23, 1992) ("If a customer does not inform the design engineer/custom machine company about the specifics of its production process, the design engineer/custom machine company should independently and affirmatively act to discover those specifications.").

For reasons stated in the breach of contract section above, there is insufficient evidence to conclude that the McLaine Defendants' specifications were in fact deficient. The McLaine Defendants have failed to come forward with any facts showing that their plans were not meant to encompass construction specifications for the entire Drop Lot project. The most they have done is provide evidence on what is generally expected in the industry, via the expert testimony of Durkin, who testified that in his experience, he would not "expect to see in land development plans detailed specifications." Doc. 232, at 10. On the other hand, New Prime's expert, Rajabipour, found the opposite is true of industry norms. He found the fact that the McLaine Defendants "did not specify the required quality of concrete (such as concrete type and target strength and slump) and required methods for quality control (QC) testing, construction, and curing of concrete" to be a "contribution factor[] that, in my opinion, resulted in the premature deterioration...of the concrete at the Prime Drop Lot." Doc. 284-8, at 21. In light of the conflicting expert opinions and the

woefully deficient email "contract" that contained almost no key terms to the parties' agreement, summary judgment would be premature at this stage.[3]

## V. CONCLUSION

For the reasons outlined above, the McLaine Defendants' motion for summary judgment (Doc. 219) will be denied. A separate Order will follow.

Robert D. Mariani
United States District Judge

---

[3] The Court notes that the instant motion also requests judgment in their favor against "cross-claimants Balchune, Pocono, Marranca, Marranca Contracting, and Midlantic." *Id.* ¶ 22. However, the motion does not address these crossclaims in any substantive manner. Instead, the brief solely focuses on New Prime's breach of contract and breach of warranty claims. It is well established that in the Third Circuit, "[a]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 202–03 (3d Cir. 2004). *See also John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n. 6 (3d Cir. 1997) ("arguments raised in passing...but not squarely argued, are considered waived"). Thus, the Court will not address the other defendants' crossclaims against the McLaine Defendants.